### THE PEOPLE *vs.* WILLIAM KIRBY.

Every willful and intentional taking of life of a human being without a justifiable cause, is murder at common law, if done with deliberation and not in the heat of passion, and legal malice is always implied in such cases.

It is not necessary to prove express malice or ill will against the person killed; thus when children were drowned to prevent their coming to want, it was held that the law would imply malice from the illegality of the act.

Every person is presumed to be sane until the contrary appears.

The prisoner was indicted for the murder of John Hughes, a boy four years old.

The facts, as they appeared on the trial, were as follows: The prisoner with his wife and three children, the two oldest being children of his wife by a former husband, came to the village of Ogdensburgh from Canada in search of employment, about four days before the alleged murder, and put up at a public

house. About 10 o'clock in the morning of the fourth day after his arrival at Ogdensburgh, he took the two youngest children (his own daughter about two years old, and his step-son about four years old,) to the bridge which crosses the Oswegatchie river in the village, and threw them into the river and they were then immediately carried under the ice and drowned. A woman who resided near the bridge, saw the transaction from her window and came out and asked him whose those children were, and he replied they were his. He then went deliberately into a law office near by and inquired for a magistrate, and being informed there was one present, he said he had just drowned his two children, and wished to be committed to jail before his wife found it out. He was committed for examination, and in the afternoon was examined before the magistrate, and stated, in substance, that he drowned the children in the manner above stated, and that he had it in contemplation to drown them for about a week previous. The children had given him no offence, but he drowned them because he thought it better for them to go into eternity than to stop in this world. He intended to destroy himself with the children, but at the moment he was about to do it, the thought struck him that suspicion might rest on his wife, and he determined to stay to prevent such suspicion. That for the last six months he had determined to destroy himself, and believed he should have been happy if he had drowned himself with the children. He was educated a Christian and believes in the gospel.

Prisoner was cool and collected, and to the question, did he not know he was commanded by the scripture not to kill, he replied, " The Lord did not destroy Cain."

A physician attended the examination of the prisoner, and endeavored in a variety of ways to ascertain, if possible, whether he was insane generally or partially, or on any particular subject, and he could discover nothing to induce a belief that the prisoner was insane. The sheriff and jailor, in whose custody the prisoner had been for eight months before the trial, testified that during that time he had discovered nothing like insanity, or to induce him to think he was not in the possession

of his senses like other men.   The sheriff also produced several quires of manuscript, written by the prisoner on religious subjects while in jail, which contained no evidences of mental derangement, but, on the contrary, exhibited much strength of reasoning and showed that the prisoner must have received a good education.

Several witnesses from Canada, where the prisoner had worked the previous summer, testified that he acted rather singularly, was frequently in a reverie, and was writing a considerable part of the time when not employed at labor.   His family were then absent and he appeared very anxious to have them come to him, and when they did come, he appeared very affectionate to his wife and the children.   He sometimes talked of destroying himself, and one night he went out, as he said, for the purpose of drowning himself.   The family where he boarded became alarmed, and were out several hours in pursuit of him, along the shores of the river, but did not find him.   During the night he got into the house through the window, and in the morning he said if the tavern keeper had given him a gill of liquor he should have then been in eternity, but he would not give it him.   At another time he told a British sergeant he was a deserter, and went with him to the fort to deliver himself up, but returned after two or three days. One of the clergymen of the place, who had frequently visited prisoner in jail since his confinement, had conversed with him on religious subjects, thought some of his ideas very singular and his mind sometimes appeared confused.   One time he asked witness if he thought sin would damn a man, and on witness answering in the affirmative, he replied he thought it was not sin but unbelief that damned men.   Witness told him God hated sinners with a perfect hatred, and he said he did not believe it.   That it was sin God hated, but he did not hate sinners.   These were the ideas he thought singular, and which induced him to think prisoner's mind was not perfect. He generally appeared serious and solemn, but would sometimes indulge in ill-timed laughter when they were conversing on serious subjects.

The People *v.* Kirby.

*F. Atwater* and *J. Kirtland,* the counsel for the prisoner, contended that there was sufficient evidence to satisfy the jury the prisoner was laboring under mental derangement. But if they were not satisfied of that fact, the prisoner could not be convicted of murder, for there was no evidence of malice against the children, but, on the contrary, it appeared he was much attached to them.

WALWORTH, *Circuit Judge,* charged the jury that if they were satisfied the prisoner was in the perfect possession of his mental faculties, he was guilty of murder, although he had no express malice against the children; that if he intended to destroy himself, and drowned the children to prevent their coming to want, or to relieve his wife from the burden of supporting them, the law implied malice from the illegality of the act. Every willful and intentional taking the life of a human being, without a justifiable cause, is murder, if done with deliberation and not in the heat of passion, and legal malice is always implied in such cases.

That the important question in this case was, whether the prisoner was under the influence of mental derangement at the time the act was done. If such was the case, he was not guilty of any crime whatever. But if he was in the perfect possession of his senses, it was murder. That this was a question of fact which belonged to the jury exclusively to decide; that every person was presumed to be sane until the contrary appeared; that there were several circumstances in this case from which an inference might be drawn that the prisoner had not his perfect mind. And the court referred to the time, place and manner of the act and the particular circumstances attending it, as some of the strongest evidences in the case to show a deprivation of reason.

The jury retired, and after being out about thirty minutes, returned a verdict of guilty against the prisoner.

The circuit judge, however, doubting the sanity of the prisoner, reported the case to the governor, who commuted the punishment.